

EMN:DAL/PT
F.#2015R01825

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

FABIO TORDIN,

           Defendant.

I N F O R M A T I O N

Cr. No. 15-564 (RJD)
(T. 18, U.S.C., §§
981(a)(1)(C), 1349 and
3551 et seq.; T. 21,
U.S.C., § 853(p); T. 26,
U.S.C., § 7206; T. 28,
U.S.C., § 2461(c))

- - - - - - - - - - - - - - - - - -X

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION TO ALL COUNTS

    At all times relevant to this Information, unless otherwise indicated:

I.    Background

    A.    FIFA

    1.    The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer, commonly known outside the United States as football.  FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland.  FIFA comprised as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories.  The United States first

became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa, and the United States Virgin Islands following in the 1990s.  At various times, FIFA maintained offices both in Zurich and elsewhere in the world, including in the United States, where FIFA maintained a development office since at least 2011.

2.    Each of FIFA's member associations also was a member of one of six continental confederations recognized by FIFA: the Confederation of North, Central American, and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC").  Since at least 1996, under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations.  Since at least 2004, member associations were required to pay to FIFA annual dues, known as subscriptions.

3.    FIFA was governed by: a congress composed of its member associations, which acted as the association's highest legislative body; an executive committee, which acted as the executive body; and a general secretariat, which acted as the administrative body.  FIFA also had a president, who represented

2

the association worldwide and was responsible for the
implementation of decisions.  FIFA also operated several
standing committees whose members included soccer officials from
various national member associations.

        4.   Since at least 1996, under FIFA's statutes, the
six continental confederations had certain rights and
obligations, including, among other things, that they comply
with and enforce FIFA's statutes, regulations, and decisions and
work closely with FIFA to further FIFA's objectives and organize
international soccer competitions.

        5.   FIFA's purpose was, among other things, to
develop and promote the game of soccer globally by organizing
international competitions and creating and enforcing rules that
govern the confederations and member associations.  FIFA helped
finance the confederations and their member associations,
including by providing funds through the Financial Assistance
Program and the Goal Program.

        6.   FIFA first instituted a written code of ethics in
October 2004, which code was revised in 2006, again in 2009, and
most recently in 2012 (generally, the "code of ethics").  The
code of ethics governed the conduct of soccer "officials," which
expressly included, among others, various individuals with
responsibilities within FIFA, the confederations, member
associations, leagues, and clubs.  Among other things, the code

of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain.  The code of ethics further provided, from its inception, that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty.  By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues, and clubs.

7.   Among other tournaments, FIFA organized the World Cup, the sport's premier event, a quadrennial international tournament involving the senior national men's teams of 32 nations.

B.   CONCACAF

8.   CONCACAF was a continental soccer confederation incorporated, since 1994, as a non-profit corporation in Nassau, Bahamas.  CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America, the Caribbean, and three South American countries.  The United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF.  From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former

general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business.

9.   Like FIFA, CONCACAF was governed by its own congress, general secretariat, executive committee and standing committees.

10.   Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based.  CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation.  Among other tournaments, CONCACAF organized the Gold Cup, featuring the men's national teams from CONCACAF and, from time to time, other confederations, as well as a tournament featuring the top men's professional league – or club - teams.  In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

11.   CONCACAF also organized World Cup qualifier matches, using a variety of formats, and, from time to time, worked together to organize inter-confederation competitions, often with the support and approval of FIFA.

C.   The Regional Federations and National Associations

12.   In addition to being members of FIFA and their
respective continental confederations, some of the national
associations were also members of smaller, regional federations.

13.   For example, CONCACAF's member associations were
organized into three smaller regional federations: the Caribbean
Football Union ("CFU"), the Central American Football Union
("UNCAF"), and the North American Football Union ("NAFU").   The
United States Soccer Federation was thus a member association of
CONCACAF as well as NAFU, while Puerto Rico and the United
States Virgin Islands were both members of CONCACAF and CFU.

14.   The national associations, also often referred to
as "federations," worked together to organize exhibition soccer
matches between national teams, known as "friendlies," which
also took place on the club level.

D.   The Sports Marketing Companies

15.   FIFA, the continental confederations, the
regional federations and the national member associations often
entered into contracts with sports marketing companies to
commercialize the media and marketing rights to various soccer
events, including the World Cup and other tournaments, World Cup
and Olympic qualifiers, friendlies, and other events, as well as
other rights associated with the sport.   These sports marketing
companies, including multinational corporations with

headquarters, offices, or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights, and ticketing rights. These sports marketing companies often sold these rights to, among others, television and radio broadcast networks, sponsors, and sub-licensees, including those located in the United States.

16. The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for FIFA and its constituent organizations, as well as for the sports marketing companies. The United States was an increasingly important and lucrative market for the commercialization of these rights.

17. The Traffic Group was a multinational sports marketing company based in São Paulo, Brazil. The Traffic Group was comprised of, among other entities, Traffic Assessoria e Comunicações S/C Ltda. ("Traffic Brazil"), Traffic Sports International, Inc. ("Traffic International"), Traffic Sports USA, Inc., Traffic Sports Europe B.V., and Continental Sports International, Inc. (referred to collectively herein as "Traffic" or the "Traffic Group"). Beginning in or about 1990, Traffic expanded its operations into the United States, partnering with and later acquiring a Florida company called

7

Inter/Forever Sports, Inc., which was renamed Traffic Sports USA, Inc. (collectively referred to below as "Traffic USA") in or about 2003.

18.   Sports Marketing Company A was a sports marketing company based in Miami, Florida.   Sports Marketing Company A was a subsidiary of Media Company A, which engaged in a variety of media activities primarily in the United States and Latin America, including television production and the commercialization of sports marketing rights.   Media Company A, which was also based in Miami, Florida, was affiliated with Media Company B, a multinational media conglomerate based in Europe.   The identities of Sports Marketing Company A, Media Company A, and Media Company B are known to the United States Attorney.

19.   Sports Marketing Company B was a sports media and marketing business with its principal offices in Argentina. Sports Marketing Company B had a number of subsidiaries and affiliates, all of which are referred to collectively below as "Sports Marketing Company B."   The identity of Sports Marketing Company B is known to the United States Attorney.

II.   The Defendant

20.   The defendant FABIO TORDIN was a citizen of
Brazil, and beginning in or about 2005, a legal permanent
resident of the United States.

21.   In or about and between 1999 and 2002, the
defendant FABIO TORDIN was employed in the finance department of
Traffic Brazil, working out of the São Paulo office.   In or
about and between 2003 and 2006, TORDIN served as the chief
executive officer of Traffic USA in Miami, Florida.   In or about
and between 2007 and 2010, while remaining based in Miami,
TORDIN was self-employed, including as a consultant in the field
of soccer and media marketing rights.   In or about and between
2011 and the present, TORDIN worked as an executive at Sports
Marketing Company A in Miami.

III. The Defendant's Co-Conspirators

22.   The identities of the following individuals are
known to the United States Attorney:

23.   At various times relevant to this Information,
Co-Conspirator #1 was a consultant in the area of negotiating
soccer media and marketing rights, principally with certain
CONCACAF member associations.

24.   At various times relevant to this Information,
Co-Conspirator #2 was a consultant in the area of negotiating

soccer media and marketing rights, principally with certain
CONCACAF member associations.

25.  At various times relevant to this Information,
Co-Conspirator #3 was a high-ranking executive of Sports
Marketing Company A and Media Company A.

26.  At various times relevant to this Information,
Co-Conspirator #4 was a controlling principal of Sports
Marketing Company B.

27.  At various times relevant to this Information,
Co-Conspirator #5 was a controlling principal of Sports
Marketing Company B.

28.  At various times relevant to this Information,
Co-Conspirator #6 was a high-ranking official of FIFA, CONCACAF,
and one of FIFA's national member associations.

29.  At various times relevant to this Information,
Co-Conspirator #7 was a high-ranking official of FIFA
representing the CONCACAF region.

30.  At various times relevant to this Information,
Co-Conspirator #8 was a high-ranking official of CONCACAF and
one of FIFA's national member associations, and an official of
FIFA.

IV.  The Fraudulent Schemes

31.  Beginning in or about 2004, the defendant FABIO
TORDIN, together with others, participated in a series of

10

bribery schemes in order to obtain media and marketing rights to soccer matches from certain CONCACAF member associations. The defendant and his co-conspirators planned the schemes in the United States, among other locations, and used the wires of the United States to carry out the schemes, including by paying bribes from accounts at financial institutions in the United States. As part of these schemes, TORDIN and his co-conspirators over time agreed to pay millions of dollars of bribes to high-ranking officials of several of CONCACAF's member associations.

A.    World Cup Qualifiers Scheme – Traffic USA

32.    Since at least in or about 1998, the media rights to matches played to qualify for the World Cup have been owned by the team designated as the "home team" for each qualifier match. UNCAF's member associations sought to generate revenue by, among other things, selling the media rights they owned to their home World Cup qualifier matches. Each of the UNCAF member nations negotiated separately with prospective purchasers of the rights, which included Traffic USA. UNCAF member associations included UNCAF Federation A, UNCAF Federation B, UNCAF Federation C, and UNCAF Federation D, the identities of which are known to the United States Attorney.

33.    During the period that the defendant FABIO TORDIN worked at Traffic USA in Miami, his responsibilities included

11

overseeing the purchase by Traffic USA of rights owned by
certain CONCACAF member associations, including those of UNCAF,
to matches played by these associations in order to qualify for
the 2010 World Cup.  In or about and between 2004 and 2006, in
order to obtain and renew these rights for Traffic USA, TORDIN,
together with others, agreed to pay, and did pay, bribes to
high-ranking officials of the member associations that owned and
controlled those rights.

34.  Payments in furtherance of this scheme were made
by wire transfer from and through bank accounts in the United
States to bank accounts outside the United States.  Moreover,
the conspirators used fictitious contracts and invoices, among
other methods and means, in order to conceal the true nature and
purpose of bribe payments made in furtherance of the scheme.

B.  World Cup Qualifiers Scheme – Sports Marketing Company A

35.  In or about 2006, the defendant FABIO TORDIN left
Traffic USA.  In or about 2009, TORDIN and Co-Conspirator #1,
who was also based in Miami, were engaged as paid consultants to
Sports Marketing Company A, and in that capacity they agreed to
help Sports Marketing Company A obtain media and marketing
rights from certain CONCACAF member associations.

36.  The defendant FABIO TORDIN, together with Co-
Conspirator #1, and on behalf of Sports Marketing Company A,
thereafter negotiated contracts with UNCAF Federation A and

12

UNCAF Federation B to purchase media and marketing rights to qualifier matches played in connection with the 2014 World Cup. In order to obtain those rights, in or about and between 2009 and 2011, TORDIN, Co-Conspirator #1, and Co-Conspirator #3 agreed to pay, and did pay, bribes to high-ranking officials of UNCAF Federation A and UNCAF Federation B.

37.   In or about 2011, Co-Conspirator #3 hired the defendant FABIO TORDIN to work as an executive at Sports Marketing Company A in Miami.   Among other things, TORDIN was tasked with negotiating and obtaining for Sports Marketing Company A contracts for media and marketing rights held by CONCACAF member associations.

38.   In or about and between 2011 and 2015, the defendant FABIO TORDIN, together with others, including Co-Conspirator #3, caused Sports Marketing Company A to enter into contracts with UNCAF Federation A and UNCAF Federation B, and together with Co-Conspirator #2 and Co-Conspirator #3, UNCAF Federation C, to obtain media and marketing rights to these federations' 2018 and/or 2022 World Cup qualifier matches.   In order to obtain those contracts, TORDIN, together with others, agreed to pay, and did pay, bribes to high-ranking officials of the three federations.

39.   In or about the spring of 2012, Sports Marketing Company A and Traffic USA, which until that time had been

13

competitors, agreed to pool their resources and share revenue earned from the purchase of rights to World Cup qualifier matches played by CONCACAF member associations.

40.  Traffic USA owned the rights to qualifier matches hosted by UNCAF Federation D in connection with the 2014 and 2018 World Cups.  In or about 2014, the defendant FABIO TORDIN learned that, rather than renewing its contract with Traffic USA, UNCAF Federation D was contemplating selling the rights to its qualifier matches played in connection with the 2022 World Cup to another company.

41.  The defendant FABIO TORDIN, Co-Conspirator #2, and Co-Conspirator #3 thereafter agreed to pay, and did pay, a bribe to a high-ranking official of UNCAF Federation D in order to cause that federation to renew its contract with Traffic USA, which, as noted, had a revenue-sharing agreement with Sports Marketing Company A.

42.  Payments in furtherance of this scheme were made by wire transfer from and through bank accounts in the United States to bank accounts outside the United States.  Moreover, the conspirators used fictitious contracts and invoices, among other methods and means, in order to conceal the true nature and purpose of bribe payments made in furtherance of the scheme.

C.    Friendly Matches Rights Scheme

43.    In or about and between 2009 and 2015, the defendant FABIO TORDIN and Co-Conspirator #2 partnered to organize and promote friendly matches involving UNCAF Federation A and UNCAF Federation B, as well as matches involving other FIFA member associations.   Many of these friendly matches were played at venues in the United States.   In order to obtain the agreement of the federations to participate in these friendly matches, TORDIN and Co-Conspirator #2 agreed to pay, and did pay, bribes to high-ranking officials of UNCAF Federation A and UNCAF Federation B.

44.    Payments in furtherance of this scheme were made by wire transfer from and through bank accounts in the United States to bank accounts outside the United States.   Moreover, the conspirators used fictitious contracts and invoices, among other methods and means, in order to conceal the true nature and purpose of bribe payments made in furtherance of the scheme.

D.    CONCACAF Media and Marketing Rights Scheme

45.    In or about and between November 2011 and January 2012, the defendant FABIO TORDIN and Co-Conspirator #2, together with others, agreed to help facilitate the payment of bribes by Co-Conspirator #4 and Co-Conspirator #5 to Co-Conspirator #6, Co-Conspirator #7, and Co-Conspirator #8, soccer officials with significant authority within CONCACAF, in order to cause

15

CONCACAF to sell to Sports Marketing Company B the rights to certain soccer tournaments, including the Gold Cup. At the time, Co-Conspirator #7 was one of CONCACAF's three representatives on the FIFA executive committee, and Co-Conspirator #6 and Co-Conspirator #8 were both members of the CONCACAF executive committee.

46. In or about November 2011, upon invitation by Co-Conspirators #4 and #5, the defendant FABIO TORDIN and Co-Conspirator #2 flew from Miami to Buenos Aires, Argentina. During the days that followed, in Argentina and in Uruguay, TORDIN and Co-Conspirator #2 met with Co-Conspirator #4 and Co-Conspirator #5, who controlled Sports Marketing Company B, and Co-Conspirator #6, Co-Conspirator #7 and Co-Conspirator #8. In the course of and as a result of these meetings, Co-Conspirator #6, Co-Conspirator #7, and Co-Conspirator #8 agreed to seek to cause CONCACAF to sell the media and marketing rights to certain soccer tournaments to Sports Marketing Company B. To obtain this agreement, Co-Conspirator #4 and Co-Conspirator #5 agreed to pay, and did pay, bribes to the three soccer officials.

47. In or about 2012, Co-Conspirator #5 traveled to Florida in furtherance of Sports Marketing Company B's efforts to obtain these rights.

48. Payments in furtherance of this scheme were made by wire transfer from and through bank accounts in the United

States to bank accounts outside the United States.  Moreover,
the conspirators used fictitious contracts and invoices, among
other methods and means, in order to conceal the true nature and
purpose of bribe payments made in furtherance of the scheme.

* * * *

49.  No disclosure of the foregoing bribery schemes
was made to FIFA or CONCACAF, including without limitation to
their respective executive committees, congresses, or
constituent organizations.

COUNT ONE
(Wire Fraud Conspiracy – World Cup Qualifiers Scheme)

50.  The allegations contained in paragraphs 1 through
49 are realleged and incorporated as if fully set forth in this
paragraph.

51.  In or about and between 2009 and 2015, both dates
being approximate and inclusive, within the Southern District of
Florida, the defendant FABIO TORDIN, together with others, did
knowingly and intentionally conspire to devise a scheme and
artifice to defraud FIFA, CONCACAF, and national member
associations and their constituent organizations, including to
deprive FIFA, CONCACAF, and national member associations and
their constituent organizations of their respective rights to
honest and faithful services through bribes and kickbacks, and
to obtain money and property by means of materially false and

17

fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, telephone calls, and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Wire Fraud Conspiracy – Friendly Matches Scheme)

52.   The allegations contained in paragraphs 1 through 49 are realleged and incorporated as if fully set forth in this paragraph.

53.   In or about and between 2009 and 2015, both dates being approximate and inclusive, within the Southern District of Florida, the defendant FABIO TORDIN, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and national member associations and their constituent organizations, including to deprive FIFA, CONCACAF, and national member associations and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and

18

fraudulent pretenses, representations, and promises, and for the
purpose of executing such scheme and artifice, to transmit and
cause to be transmitted by means of wire communication in
interstate and foreign commerce, writings, signs, signals,
pictures, and sounds, to wit: wire transfers, telephone calls,
and emails, contrary to Title 18, United States Code, Section
1343.

(Title 18, United States Code, Sections 1349 and 3551
et seq.)

### COUNT THREE
(Wire Fraud Conspiracy –
CONCACAF Media and Marketing Rights Scheme)

54.  The allegations contained in paragraphs 1 through
49 are realleged and incorporated as if fully set forth in this
paragraph.

55.  In or about and between November 2011 and May
2012, both dates being approximate and inclusive, within the
Southern District of Florida, the defendant FABIO TORDIN did
knowingly and intentionally conspire to devise a scheme and
artifice to defraud FIFA and CONCACAF and their constituent
organizations, including to deprive FIFA and CONCACAF and their
constituent organizations of their respective rights to honest
and faithful services through bribes and kickbacks, and to
obtain money and property by means of materially false and
fraudulent pretenses, representations, and promises, and for the

purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, telephone calls, and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT FOUR
### (Fraud and False Statements in Tax Returns)

56. The allegations contained in paragraphs 1 through 49 are realleged and incorporated as if fully set forth in this paragraph.

57. On or about April 15, 2014, within the Southern District of Florida, the defendant FABIO TORDIN, a resident of Florida, did knowingly and willfully make and subscribe a United States Personal Income Tax Return, Form 1040, for the tax year 2013, which was verified by a written declaration that it was made under penalties of perjury and which was filed with the Internal Revenue Service, which tax return TORDIN well knew was not true and correct as to every material matter, in that said return reported that he had taxable income of $249,558, whereas,

as TORDIN then and there well knew and believed, he received taxable income substantially greater.

(Title 26, United States Code, Section 7206(1); Title 18, United States Code, Sections 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH THREE

58.  The United States hereby gives notice to the defendant that, upon his conviction of the offenses charged in Counts One through Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of such offenses.

59.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))


ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK